*In re* MARRIAGE OF CYNTHIA M. MARCELLO, Petitioner-Appellant, and MICHAEL A. MARCELLO, Respondent-Appellee.

First District (6th Division)   No. 1—91—3704

Opinion filed May 21, 1993.

---

Edward R. Jordan, of Wheeling, for appellant.

Robert S. Bailey and Erika Cunliffe, both of Chicago, for appellee.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

On October 17, 1991, the trial court entered a judgment dissolving the marriage between petitioner, Cynthia M. Marcello and respondent, Michael A. Marcello. The judgment barred Cynthia from receiving maintenance, ordered joint custody of the couple's 12-year-old son, provided for Michael's payment of child support, and also distributed the property of the parties. Cynthia appeals, contending that the order of joint custody and the bar against maintenance are against the manifest weight of the evidence. In addition, Cynthia challenges the court's valuation and distribution of marital assets and liabilities, and the apportionment of marital debt.

The parties were married on April 9, 1978, and had one child, Salvatore Michael Marcello (Sammy), who was born on May 28, 1979. The parties separated in November 1987. Sammy is in good health, has performed well in school, and has been enrolled in a science program for gifted students.

After the parties married, they lived in Elk Grove Village in a home owned by Cynthia prior to the marriage. In 1972, Cynthia had purchased the home for $36,500, subject to a mortgage debt of $32,000. The balance on the mortgage was $31,532 at the time of the marriage. The principal balance owed on the mortgage was $24,237 at the time of trial, which demonstrated a reduction of $7,295 from 1978 through 1991.

In 1987, the parties purchased a second home in Williams Bay, Wisconsin, for $80,000. Michael's mother loaned the couple $18,162.10 to purchase the property.

Cynthia, age 43, has a high school education. At the time of trial, she worked at a suburban hotel as a concierge. Her gross income for 1990 was $10,489.29. Cynthia's monthly net income during 1991 was $1,266.05, which included $375 as child support and $200 as temporary maintenance. Her monthly mortgage payment was $479, and her child care expenses were $150. In the pretrial memorandum, Cynthia described the condition of her health as "fair," and that she suffered from lupus and the residual effects of a laminectomy.

At trial, Cynthia stated that her health was "very, very bad," and that she was under the care of two physicians. She had back pain as well as pain in her joints, general fatigue, muscle aches, depression, and blood in her urine. She was taking two different medications. She was currently employed on a full-time basis as a concierge at a large hotel, but her position was subject to lay-offs during holiday seasons and low occupancy periods. Cynthia had previously worked as a hair-

dresser until she developed a skin problem which required her to stop such work many years prior to the parties' separation. Her other work experience included employment at a travel agency, retail experience selling purses from her home, and employment as a cocktail waitress.

Cynthia stated that her father made a number of loans totalling approximately $40,000 to her and Michael throughout the course of their marriage. She never kept a record of the loans, but during the two-year period prior to the parties' separation she kept bank deposit slips as evidence of those transactions. The deposit slips totalled approximately $8,500. Cynthia's sister paid off a loan in the amount of $787.49 for a furniture bill owed by the couple, which Michael had promised to repay. The sister had also loaned Cynthia $3,000 after the parties separated because Michael was not supporting the family.

Cynthia further testified that Michael usually participates in Sammy's school activities, has taken an active interest in his upbringing, and that he loves his son. She believed he should be permitted to participate in decisions regarding Sammy's school and religious education. Similarly, she offered no opposition to Michael's participation in decisions concerning Sammy's medical treatment. Cynthia did not object to Sammy spending time with Michael so long as she was apprised of his whereabouts. She stated that on certain occasions Sammy expressed a dislike for spending time with his father when he arrived unexpectedly or while Sammy was at a friend's house.

Michael, age 39, worked as a circulation driver for a Chicago newspaper. He earned $715 per week. In December 1988, he sustained a work-related shoulder injury. At the time of trial, Michael received temporary disability payments of $436.19 per week. Michael has a claim pending against his employer for this injury; however, the matter has not yet been resolved. Michael was living with his mother and occasionally paid rent.

Doctor Steven Kozlowski testified for Cynthia that he examined her in June 1986. He diagnosed Cynthia's condition as probable fibromyalgia syndrome, and suspected the possibility of systemic lupus. Doctor Kozlowski next saw Cynthia in June 1987, and ordered a CT scan of the lumbar spine and an electro-myelogram. At that time, Cynthia suffered a herniated disk. She underwent a laminectomy, and he found definite evidence of auto-antibodies in her serum. Cynthia, through Doctor Kozlowski, attempted to establish a connection between the prescription drugs she was taking and the disease of systemic lupus; however, the trial court sustained Michael's objection to such testimony.

Prior to trial, the court granted Cynthia's motion *in limine* barring William Galioto, Michael's brother-in-law, from testifying at trial as a witness for Michael. Galioto never responded to the subpoena to appear for a deposition at the office of Cynthia's attorney. At trial, Michael called Galioto as a witness on his behalf. Cynthia reminded the judge of his ruling that Galioto would not be permitted to testify because he wilfully violated and disobeyed a subpoena and refused to appear for his deposition. The judge did not recall making such a ruling. After conducting a brief *voir dire* of Galioto, he allowed him to testify. Galioto testified that Michael told him that he needed $9,809.06 because the Williams Bay property was going into foreclosure. Galioto loaned the money to Michael, and it had not yet been repaid.

Michael's monthly financial obligations included child support of $375; maintenance in the amount of $200 per month; mortgage payments of $740 on the Wisconsin property; utility bills of $100 and union dues in the amount of $40.

On May 1, 1989, the court entered an order requiring Michael to pay Cynthia the sum of $275 per month as temporary maintenance, and $473 as temporary child support. In the final judgment entered on October 17, 1991, Michael was ordered to pay Cynthia the sum of $375 per month for child support, and $75 per month as one-half of the child's monthly day-care expenses. Cynthia was not awarded any maintenance. The court concluded that Cynthia had already received maintenance for four years (in fact, it was for a period of two years) and that she had not established any disability that would preclude her from maintaining employment.

The home located in Elk Grove Village which Cynthia owned prior to the marriage was characterized as Cynthia's nonmarital property. According to the judge, the parties reduced the mortgage from $31,500 to $22,000, representing a net decrease of $9,500 while Michael resided in the house. The court allowed each party a credit of $4,750 toward said reduction. In addition, the court found that structural improvements were made to the home including a remodeled recreation room, new bathroom, central air conditioning, storm windows and screens, and a new back porch at a total cost of $20,000. The court granted Michael $10,000 credit as his share of the marital funds used to make the improvements.

The court characterized the Williams Bay home as marital property. After reviewing exhibits and hearing the testimony of expert witnesses, the court found the value of the property to be $99,500. The court found debts against the property in the amount of $20,500

(loan from Michael's mother); $9,809.96 (loan from Galioto); and a $61,500 mortgage. After deducting those debts, the court found the net value of the property to be $8,000. The court awarded the property to Michael, and granted Cynthia $4,000 credit as her share of the property.

The judge addressed the couple's debts as well and determined that a $1,619.51 debt against a credit management company and a hospital debt for an undetermined amount for services rendered to Cynthia were marital obligations. Each party had a 50% obligation to those creditors. The court found no debt owing to Cynthia's father due to lack of specificity regarding the terms of the loan and the absence of any documentation. The potential monetary award that Michael was to receive as a result of his injury on the job was classified as marital property which entitled Cynthia to one-half of any sum eventually awarded to Michael.

On appeal, Cynthia first asserts that the order of joint custody is ·contrary to the manifest weight of the evidence. Cynthia complains that Michael telephoned Sammy several times a day, and she believes that Michael's telephone access to Sammy should be limited. She further stated that there have been instances of unannounced and unexpected visitation which occurred at her home as well as Sammy's school, and that on several occasions Michael acted inappropriately by picking Sammy up at school and not providing notice to her. She argues that such behavior evinces the parties' inability to cooperate as required in joint custodial situations.

Generally, a joint custody order consists of an arrangement whereby both parents retain custody of the child and jointly participate in reaching major decisions affecting the child's welfare. (*In re Marriage of Drummond* (1987), 156 Ill. App. 3d 672, 509 N.E.2d 707.) The circumstances under which the entry of an order of joint custody is appropriate are found in section 602.1 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1989, ch. 40, par. 602.1(c)), as set forth below:

> "The court may enter an order of joint custody if it determines that joint custody would be in the best interests of the child, taking into account the following:
>
> (1) the ability of the parents to cooperate effectively and consistently with each other towards the best interest of the child;
>
> (2) The residential circumstances of each parent; and
>
> (3) all other factors which may be relevant to the best interest of the child." (Ill. Rev. Stat. 1989, ch. 40, par. 602.1(c).)

These statutory prerequisites evidence an intent that joint custody only be awarded where circumstances indicate that the parents are willing to cooperate in the upbringing of their children. *In re Marriage of Drummond*, 156 Ill. App. 3d 672.

Either party can move for an award of joint custody, or the court can make the award on its own motion. (*In re Marriage of Bush* (1989), 191 Ill. App. 3d 249, 547 N.E.2d 590.) Custody is determined pursuant to the terms of a joint parenting agreement or order. The order shall specify each parent's powers, rights and responsibilities for the personal care of the child and for major decisions such as education, health care, and religious training. In addition, the order shall further specify a procedure by which changes or disputes may be mediated or otherwise resolved. Ill. Rev. Stat. 1989, ch. 40, par. 602.1(b).

In the present case, the joint parenting order was incorporated into the judgment of dissolution and addressed the parties' level of commitment, information sharing, decision making, and quality contact and visitation. The order set forth a specific visitation schedule and also stated that there will be no surprise visits or encounters by Michael or deviation from the visitation schedule. A provision was included which stated that in the event the parents cannot agree concerning a vital decision affecting the welfare of the child, the trial court retained continuing jurisdiction to adjudicate any disputed issue.

It is well established that in determining custody, the trial court must assess what is in the "best interest" of the child, and in doing so, must consider all relevant factors. (*In re Marriage of Radae* (1991), 208 Ill. App. 3d 1027, 567 N.E.2d 760; *In re Marriage of Sorenson* (1984), 127 Ill. App. 3d 967, 469 N.E.2d 440.) In light of the trial court's superior opportunity to observe witnesses and evaluate evidence, the trial court is given broad discretion in making a custody determination. *In re Custody of Krause* (1982), 111 Ill. App. 3d 604, 444 N.E.2d 644.

■ In the present case, the trial judge's award of joint custody was not against the manifest weight of the evidence. At trial, Cynthia stated that Michael participates in Sammy's school activities and has taken an active interest in his upbringing. She did not believe Michael should be excluded from decisions regarding Sammy's education, religious training or medical treatment. Michael and Cynthia lived in adjoining towns, and Michael drove Sammy to school on many occasions. We also note that the parties had lived apart for several years, yet Michael maintained frequent contact with his son. When Cynthia underwent surgery, Sammy spent a considerable amount of time with his father, and his academic progress was not affected.

The cases in which this court has overturned joint custody awards are factually distinguishable from the present case. In the *Drummond* case, there was no joint parenting agreement or order, mediation between the parties failed, testimony indicated the parties were unwilling to cooperate with each other, and the trial court failed to consider geographic distance between the parties (one lived in Illinois, the other in Texas). (*In re Marriage of Drummond*, 156 Ill. App. 3d at 683, 509 N.E.2d at 715.) In *Bush*, the parties repeatedly exhibited hostility toward each other, sometimes resulting in physical confrontation. In addition, counsel for both parties agreed at oral argument that there was little chance of the parties ever overcoming their mutual feelings of animosity which had existed since the child's birth. (*In re Marriage of Bush*, 191 Ill. App. 3d at 263, 547 N.E.2d at 598.) While Cynthia complained that Michael's surprise visits were disruptive, the trial judge was clear in his admonishment that such visits would not be tolerated in the future, and this warning was included in the joint parenting order.

Cynthia next argues that the order barring her from receiving maintenance is contrary to the manifest weight of the evidence, that insufficient marital property was apportioned to her to provide for her reasonable needs, and that the court failed to consider her medical condition.

Under section 504 of the Act, an award of maintenance is based upon the following factors:

"(1) the financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

* * *

(5) the age and the physical and emotional condition of both parties;

(6) the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance." Ill. Rev. Stat. 1989, ch. 40, par. 504.

An award of maintenance is within the discretion of the trial court, and it will not be disturbed by a reviewing court unless there is an abuse of discretion or a determination that the award is against the manifest weight of the evidence. An abuse of discretion will occur where no reasonable man would take the view adopted by the trial court. (*In re Marriage of Jones* (1989), 187 Ill. App. 3d 206, 543 N.E.2d 119.) Despite the great deference we pay to the trial court's

determination in these matters, we find that the court abused its discretion when it failed to take into account all factors enumerated in section 504 with respect to an award of maintenance.

Maintenance may be awarded in any amount and for any time period which the court deems just after considering all relevant factors. (*In re Marriage of Orlando* (1991), 218 Ill. App. 3d 312, 577 N.E.2d 1334.) Maintenance may be appropriate where a spouse has little prospect of earning sufficient income to meet her needs, even if she is employed. *In re Marriage of Kristie* (1987), 156 Ill. App. 3d 821, 510 N.E.2d 14.

At the present time, Michael is receiving nontaxable disability payments in the amount of approximately $1,875 per month. This sum will increase once Michael returns to work, as he earns $715 per week, or approximately $3,100 gross per month. In view of the fact that Michael's expenses include child support in the amount of $375, mortgage payment and utilities on the Wisconsin property in the amount of $840, union dues of $40, in conjunction with the fact that he pays only minimal rent to his mother, Michael has adequate resources to provide maintenance to Cynthia, especially once he returns to work.

Cynthia's monthly income includes approximately $700 as wages as a hotel concierge, and $375 for child support and $75 as day-care expenses, totalling approximately $1,100. Cynthia's mortgage payment is $479, and she incurs child-care expenses in the amount of $150. Following the dissolution, Cynthia must acquire her own health insurance, which will cost approximately $132 per month. It appears, therefore, that without an award of some maintenance, Cynthia's income falls short of the money required to maintain her household.

In addition, we find that the trial court erred when it refused to allow Doctor Kozlowski to testify as to the connection between the prescription drugs Cynthia was taking and the disease of systemic lupus which he had previously suspected. The testimony offered by Doctor Kozlowski established that he saw Cynthia in 1986 and diagnosed her condition as probable fibromyalgia syndrome and suspected the possibility of systemic lupus. When Cynthia attempted to connect the various medications she was taking for the systemic lupus which Doctor Kozlowski had previously discussed, the trial court sustained Michael's objection. Cynthia then attempted to make an offer of proof to establish that medications she was taking were used to treat systemic lupus. The trial judge refused to allow her counsel to make an offer of proof.

If an offer of proof is necessary, it is error for the trial court to refuse counsel an opportunity to state what was proposed to be proved through the evidence. (*In re Marriage of Strauss* (1989), 183 Ill. App. 3d 424, 539 N.E.2d 808.) Each party is entitled to present evidence which is relevant to his theory of the case and which has any tendency and reason to prove any material fact in issue. *In re Interest of A.T.* (1990), 197 Ill. App. 3d 821, 555 N.E.2d 402.

■ Here, we find that it was error for the court to have refused Cynthia's offer of proof because it would have produced pertinent testimony concerning her physical condition, which was relevant to the issue of whether an award of maintenance was appropriate. Substantial testimony was introduced at trial which indicated that Cynthia had suffered recurring medical problems over the past few years. The record reveals that Cynthia had undergone a laminectomy and that she suffered from lupus. Further, she experienced back pain as well as pain in her joints, general fatigue, muscle aches, depression, and blood in her urine which necessitated the use of two different prescription drugs. It appears, therefore, that the state of Cynthia's health greatly impacted upon her ability to earn a living. Pursuant to the Act, it was incumbent upon the trial judge to have taken into account Cynthia's physical condition as a significant factor in determining whether an award of maintenance was proper.

We also note that the trial judge was incorrect when he stated that Cynthia had received maintenance for four years. The record indicates that on May 1, 1989, the court entered a temporary order requiring Michael to pay Cynthia $275 per month as temporary maintenance. The final judgment in which maintenance was barred was entered in October 1991, approximately 2½ years after the temporary maintenance award.

Cynthia next contends that the trial judge improperly granted Michael $4,750 as credit for the reduction of the mortgage lien on the Elk Grove Village residence awarded to her. Relatedly, Cynthia contends that the court's determination that structural improvements made to the property, including a new recreation room, bathroom, central air conditioning, storm windows and screens and a new back porch totalled improvements in the amount of $20,000. The judge allowed Michael a credit of $10,000 for these structural improvements. Cynthia maintains that the judge's conclusion is not supported by the record.

■ Presented with conflicting testimony on the issues, these were findings properly made by the judge as the trier of fact, and we will not disturb them. However, it appears that the mortgage had

been reduced by $7,295 rather than $9,500. The credit granted to Michael should be reduced accordingly.

■ We also reject Cynthia's argument that the trial judge erred in setting the valuation of the parties' Wisconsin property at $99,500. Each party presented the testimony of an expert witness as to the value of the property, and the judge accepted the valuation offered by Michael's expert. The trial judge did not abuse his discretion in doing so.

Cynthia also challenges the court's assignment of debt with respect to the Wisconsin property. We shall first address the judge's assessment of $20,500 against the property to repay Michael's mother. While Cynthia agrees that Michael's mother lent them $18,162.10 to purchase the property, she contends that there is no suggestion that a lien was granted to the mother or imposed against the property.

Michael's mother testified that she lent the parties the funds to purchase the Wisconsin property and that she expected to be repaid. At trial, sufficient documentation was produced to demonstrate that Michael's mother issued several checks from her savings and checking accounts which totalled $18,162.10. We find, therefore, that the trial court did not abuse its discretion when it determined that Michael's mother lent the parties the money for the down payment, and that she expected to be repaid. We note, however, that the trial judge assessed the amount due to Michael's mother as $20,500 rather than $18,162.

■ Cynthia further maintains that William Galioto should not have been allowed to testify concerning a $9,809.06 loan which he allegedly made to the parties. The trial judge forgot that he had barred Galioto from testifying for failure to appear for a deposition at the office of Cynthia's attorney and permitted him to testify at trial. In view of our remandment, Galioto will have to be deposed before testifying at any subsequent proceeding.

Finally, Cynthia contends that the trial court failed to recognize and address valid debts owed by the parties and that its method of apportionment was plain error. She first claims that the court erred when it failed to characterize the $40,000 given to the parties throughout the course of their marriage by Cynthia's father as marital debt.

■ In Illinois, a transfer from parent to child is presumed to be a gift (*In re Marriage of Rosen* (1984), 126 Ill. App. 3d 766, 467 N.E.2d 962), and the gift presumption may be overcome only by clear and convincing evidence to the contrary. (*In re Marriage of Rosen*, 126 Ill. App. 3d 766; *Varap v. Varap* (1966), 76 Ill. App. 2d 402, 222 N.E.2d

77.) Review of the record reveals that no documentation was produced to establish that Cynthia's father had in fact loaned the parties this sum of money, nor were any documents introduced to demonstrate a repayment schedule. It is the trial court's function to resolve conflicting testimony by assessing the credibility of witnesses and the weight to be accorded their testimony. A court's finding will not be disturbed unless it is against the manifest weight of the evidence. (*In re Marriage of Durante* (1990), 201 Ill. App. 3d 376, 559 N.E.2d 56.) In this case, we do not believe that the trial court abused its discretion in ruling that the money given to the parties by Cynthia's father was not marital debt.

■■ Cynthia also contends that the court failed to address certain marital medical debts, as well as a loan made by Cynthia's sister for furniture in the amount of $787.49, and $3,000 cash for living expenses. We concur with the trial court's assessment that the hospital debt owed to Good Samaritan Hospital should be shared equally by the parties. However, the trial court failed to address the apportionment of other medical debts. Therefore, the trial court is also directed to determine apportionment, if any, of the medical debts incurred by the parties and an evaluation of the debt allegedly due to Cynthia's sister.

In sum, the judgment ordering joint custody of the couple's son is affirmed. The order barring Cynthia from receiving maintenance is reversed, and the cause is remanded for further proceedings in accordance with the views expressed in this opinion. It is further ordered that, for the benefit of both parties, the trial court shall conduct a review of the maintenance order every two years.

Affirmed in part; reversed and remanded in part.

EGAN and GIANNIS, JJ., concur.